UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NINETTE ISRANI,<br><br>Plaintiff,<br><br>— against —<br><br>WELLS FARGO, N.A. and WELLS FARGO & CO.,<br><br>Defendants. | Case No. 1:24-cv-1471<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ninette Israni ("Plaintiff" or "Israni"), by and through her attorneys Mandel Bhandari LLP, for her complaint against the defendants, alleges as follows:

## NATURE OF THE ACTION

1.  Plaintiff is a former employee of Wells Fargo, N.A.  As set forth below, Plaintiff brings this complaint because Defendants illegally retaliated against her for exercising her legally-protected rights to inform her employers about conduct that she reasonably believed violated (a) laws and rules designed to protect against aiding and abetting fraud, facilitating money laundering, or otherwise helping customers use funds for illicit purposes, (b) regulations and rules about bank customer identity verification, due diligence, and ongoing monitoring or enhanced due diligence of a customer's account after it is established, and (c) securities laws and rules prohibiting material misstatements or omissions in Defendants' public filings and statements on these issues.

2.  Defendants did not take any corrective action in response to Plaintiff's complaints and instead, about a month after her disclosures, fired her.  Plaintiff seeks all appropriate relief stemming from Defendants' unlawful retaliatory termination of her employment.

**THE PARTIES**

3.      Plaintiff Ninette Israni is an individual residing in East Brunswick, New Jersey. She was formerly employed by Wells Fargo, N.A. at a branch in East Brunswick.

4.      Wells Fargo, N.A. is a national banking association with its main office in Sioux Falls, South Dakota.  Wells Fargo, N.A. is one of the largest banks in the United States by bank deposits and market capitalization.  Wells Fargo, N.A. was and is a subsidiary of Wells Fargo & Co.

5.      Wells Fargo & Co. (together with Wells Fargo, N.A., "Defendants" or "Wells Fargo") is a financial services holding company headquartered in San Francisco.  Wells Fargo & Co. is one of the largest companies in the United States and is a component of the S&P 100 Index.  The Financial Stability Board has designated Wells Fargo & Co. a systemically important financial institution.

6.      Upon information and belief, Defendants have a class of securities that must be registered under section 12 of the Securities Exchange Act of 1934, and/or are required to file reports under section 15(d) of the of the Securities Exchange Act of 1934.

7.      The Department of Labor has jurisdiction over this action because the claims asserted arise under Title VIII of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1514A).

8.      This is a whistleblower retaliation case brought by Ms. Israni against her former employers under § 806 of the Sarbanes-Oxley Act.

**JURISDICTION AND VENUE**

9.      The Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §1331 because this is an action arising under the laws of the United States, namely 18 U.S.C. § 1514A and the Sarbanes-Oxley Act of 2002 (15 U.S.C. § 7201 et seq., "SOX").

2

10.     This Court has supplemental jurisdiction over the claims arising from state law pursuant to 28 U.S.C. §1367.

11.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1).

12.     This Court has jurisdiction over Ms. Israni's claims arising under SOX because Israni timely filed a complaint against Defendants alleging violation of the anti-retaliation provisions in 18 U.S.C.A. § 1514A(a) with OSHA on July 19, 2023.  More than 180 days have lapsed since that filing and the Department of Labor has not issued a final decision.

## BACKGROUND FACTS

13.     Ms. Israni worked as a teller for Wachovia and then Wells Fargo for almost 18 years.  She was employed by Wells Fargo at its location at 756 State Route 18, East Brunswick, NJ, 08816.

14.     On March 1, 2023 she was informed that a check she deposited in December 2022 while on duty as a teller had been returned.

15.     She was surprised that such a thing could occur and, as a conscientious employee, looked into the circumstances of the returned check.  She discovered that the customer who passed the check should not have been allowed to open an account at Wells Fargo at all.

16.     Ms. Israni first reached out to Wells Fargo Human Resources about her concerns on or about March 8, and spoke to and corresponded with a Wells Fargo HR professional named Connie Snipes.

17.     Wells Fargo HR did not take Ms. Israni's concerns seriously, and on March 10 and 13, Ms. Israni reported her concerns and forwarded her letter to Ms. Snipes to the Wells Fargo EthicsLine Online Reporting system, as called for in the Wells Fargo Code of Conduct.

18.     Ms. Israni explained to Wells Fargo's EthicsLine that this customer first tried to open a personal account at Wells Fargo in person at a bank branch but was rejected, because the customer failed the "know your customer" (KYC) and anti-money laundering (AML) due diligence processes used when opening in-person accounts at the branch.

19.     Rather than turn the customer away, the banker who interacted with this customer encouraged the customer to try to open a Wells Fargo account online.  Wells Fargo's online systems then allowed this previously-rejected customer – who had failed the bank's KYC/AML processes – to open an account.  Apparently, this is a common practice at Wells Fargo:  the bank and its employees routinely encourage customers that failed KYC/AML due diligence risk screening in person to try to open accounts online, because the bank's online systems have reduced requirements for opening bank accounts than its in-person systems.

20.     Wells Fargo announced in late 2020 that it was "prioritizing automation efforts" for "know your customer" (KYC) and anti-money laundering (AML) processes "to take people out of the process, because any time you have hand-offs, you have lag time."  *Bianca Chan, BAS 2020: Wells Fargo eyes automation to speed KYC/AML processes*, BANK AUTOMATION NEWS, *available at* https://bankautomationnews.com/allposts/risk-security/bas-2020-wells-fargo-eyes-automation-to-speed-kyc-aml-processes/ (last accessed Feb. 26, 2024).  These automation efforts have created a two-tiered system, where customers who previously failed KYC/AML screens are pervasively able to open Wells Fargo accounts online.

21.     Wells Fargo is aware of the importance of appropriate AML processes and the bank's problems with AML/KYC are well documented.  In 2015, the U.S. Department of the Treasury Comptroller of the Currency expressly found that Wells Fargo N.A.'s AML processes were deficient.  *In the Matter of Wells Fargo Bank, National Association*, Consent Order #2015-

125, *available at* https://www.occ.gov/static/enforcement-actions/ea2015-125.pdf (last accessed Feb. 26, 2024).  While the Consent Order discussed certain specific problems at Wells Fargo N.A.'s Wholesale Banking Group, by its terms, it applied to "to Wells Fargo Bank, National Association and all its subsidiaries, even though those subsidiaries are not named as parties to this Order."

22.    The OCC found, and Wells Fargo neither admitted nor denied, that critical internal control deficiencies in the bank's Bank Secrecy Act/AML compliance program resulted in an internal control pillar violation under 12 C.F.R. § 21.21(d)(1), because customer risk assessment practices were not effective, customer due diligence practices were unsatisfactory, "relationship staff and front-line monitoring efforts [were] less than satisfactory," and "governance and oversight practices are not effective as evidenced by management's failure to fully address previously-cited BSA/AML problems."

23.    The Consent Order expressly required Wells Fargo, N.A. to set up an electronic due diligence database readily accessible to the parties responsible for the customer relationship and AML compliance personnel with information about the customer's relationships with the bank; periodically update customer due diligence "to reflect changes in the customer's behavior, activity profile, derogatory information, periodic reviews of the customer relationship, or other factors that impact the BSA/AML risk for the client"; and establish "Processes to periodically review, based on the relationship risk, the type, volume, and value of customer activities in relation to normal and expected levels."

24.    The Consent Order also mandated that Wells Fargo maintain an "effective system/tool" to provide relationship staff with the ability to update customer due diligence as needed, and required it to ensure "the integrity of the data feeding the system/tool."

25.     Wells Fargo claimed the OSS terminated this Consent Order in January 2021, and that "Building the right risk and control infrastructure and remediating our legacy issues remain our top priority, and the termination of this consent order is evidence of our progress," according to Wells Fargo CEO Charlie Scharf.  *See* Wells Fargo Announces Termination of AML-Related Consent Order, *available at* https://newsroom.wf.com/English/news-releases/news-release-details/2021/Wells-Fargo-Announces-Termination-of-AML-Related-Consent-Order/default.aspx (last accessed Feb. 26, 2024).

26.     Wells Fargo's 2021 Annual Reports claimed that the end of the Consent Order was a "regulatory milestone" the bank had achieved in 2021, and its SEC filings similarly touted that the bank "maintains an extensive system of internal controls in order to provide reasonable assurance that assets are safeguarded and all transactions are properly recorded," and that "The company is committed to accurate, timely, and clear disclosures to regulatory authorities, customers, shareholders, and the public."

27.     Ms. Israni observed conduct at Wells Fargo that she reasonably believed belied its public statements about compliance with KYC/AML requirements and corrections of the problems identified in the 2015 Consent Order.

28.     Wells Fargo's non-compliance with KYC/AML requirements has affected its stock price.  Liz Moyer, Wells Fargo shares slip on report that employees altered customer documents (CNBC May 17, 2018), *available at* https://www.cnbc.com/2018/05/17/wells-fargo-shares-sink-on-report-that-employees-altered-customer-documents-in-its-business-banking-unit.html (last accessed Feb. 26, 2024).

29.     In her complaint to the EthicsLine Online Reporting system, Ms. Israni relayed her concerns that Wells Fargo's streamlined online account opening process exposed it to

potential noncompliance with KYC/AML requirements, other federal and state laws, facilitating

money laundering, or otherwise helping customers use funds for illicit purposes.

30.     This practice of reduced diligence for opening online accounts also exposed the

bank to potential noncompliance with requirements about customer identity verification, due

diligence, and ongoing monitoring or of a customer's account after it is established.

31.     Indeed, despite having failed the in-person risk screening for KYC/AML, this

customer later opened other accounts at Wells Fargo, including merchant service and business

accounts, and also eventually took out loans from the bank.

32.     This customer also came into the bank multiple times to exchange small

denominations of bills to large denominations.  Employees of the bank were suspicious of the

exchanges, but were encouraged to facilitate these transactions.

33.     Upon information and belief, despite the unusual and repeated requests to

exchange small denominations of notes to large denominations that aroused suspicion among

employees, no Suspicious Activity Reports were ever filed by Wells Fargo in connection with

this customer.

34.     Rather than act to fix its internal procedures, adhere to its own stated policies, or

live up to its statements to the public, Wells Fargo retaliated against Ms. Israni.

35.     After she sent the letter with her concerns about this customer to the EthicsLine

Online Reporting system, Defendants claimed the returned check from December 2022 was Ms.

Israni's fault.

36.     Allegedly, the bounced check had been endorsed for as "valid for mobile deposit

only," but Ms. Israni had not (i) asked the customer to strike the endorsement, (ii) required that

he initial that strike-through, and then (iii) gotten specific authorization to approve depositing the check with the modified endorsement.

37.    But no one at Ms. Israni's Wells Fargo branch was familiar with this process, and her branch manager and service manager admitted they knew nothing about it.

38.    Moreover, other tellers at Wells Fargo deposited checks with "valid for mobile deposit only" endorsements without incident.

39.    Upon information and belief, Ms. Israni is the first teller to be fired in her region for not following this supposed restrictive endorsement policy.

40.    Ms. Israni's disclosures of her reasonable, good faith concerns about Defendants' practices to their Human Resources department and EthicsLine Online Reporting system were a contributing factor in her termination.

41.    Defendants would have retained – and did retain –employees who were otherwise identical to Ms. Israni who had *not* made disclosures to Defendants' Human Resources department and EthicsLine Online Reporting system.

42.    Ms. Israni was so shocked by Wells Fargo's retaliation that she had to take a temporary leave of absence for mental health reasons.

43.    Ms. Israni went on leave on March 22 and returned to work on April 10.

44.    Two days later, Wells Fargo fired Ms. Israni on April 12, 2023.

45.    On July 19, 2023, Ms. Israni filed a complaint with OSHA under the provisions of the Sarbanes-Oxley Act preventing retaliation against whistleblowers.

46.    Defendants filed responsive documents, and in their Opposition Statement, Defendants detailed the reasons they supposedly terminated Ms. Israni.

47.     These reasons were false and pretextual, and willfully misrepresented both the substance of Ms. Israni's complaint and the circumstances of her termination.  Defendants' Opposition Statement did not deny that Ms. Israni was the first employee in her region to be fired for violating the supposed restrictive endorsement policy.

**COUNT ONE**
**(SARBANCES-OXLEY WHISTLEBLOWER RETALIATION)**

48.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

49.     Defendants are covered by the Sarbanes Oxley Act because, upon information and belief, Defendants have a class of securities that must be registered under section 12 of the Securities Exchange Act of 1934, and/or are required to file reports under section 15(d) of the of the Securities Exchange Act of 1934.

50.     Plaintiff made good faith disclosures to Defendants about conduct she reasonably believed violated federal criminal prohibitions against securities fraud, bank fraud, mail fraud, or wire fraud, and/or any rule or regulation of the Securities and Exchange Commission, including those concerning Anti-Money Laundering rules, Know Your Customer regulations, the Bank Secrecy Act and related compliance requirements, including the SEC's Internal Control Rules and the prohibition of fraud against shareholders by a publicly traded company in Title 15 of the United States Code, § 78j and 17 C.F.R. § 240.10b-5, known as Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, respectively, as well as section 17(a) of the Securities Act of 1933, prohibiting material misstatements or omissions in a company's public filings and statements.

51.     Plaintiff's disclosures were protected under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A.

52.     About a month after Plaintiff made these disclosures, Defendants unlawfully

terminated her in retaliation for her whistleblowing, in violation of 18 U.S.C.A. § 1514A.

53.     On July 19, 2023, Plaintiff filed a whistleblower complaint with OSHA against

Defendants alleging violation of the anti-retaliation provisions in 18 U.S.C.A. § 1514A.  More

than 180 days have lapsed since that filing and the Secretary of Labor has not issued a final

decision.

54.     As a result of Defendants' misconduct, Plaintiff was harmed by the loss of income

and benefits, reputational damage, personal humiliation and anguish, and by incurring attorneys'

fees.

**COUNT TWO**
**(RETALIATION IN VIOLATION OF**
**NEW YORK STATE WHISTLEBLOWER PROTECTION LAW,**
**LABOR LAW SECTION 740)**

55.     Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every preceding paragraph as if fully set forth herein.

56.     Defendants wrongly engaged in unlawful retaliatory practices in violation of the

New York State Whistleblower Protection Law, Section 740 of the New York Labor Law, by

firing Plaintiff after she made good faith disclosures to Defendants' Human Resources

department and their EthicsLine Online Reporting system about Defendants' activities, policies

and/or practices she reasonably believed violated (a) laws and rules designed to protect against

aiding and abetting fraud, facilitating money laundering, or otherwise helping customers use

funds for illicit purposes, (b) regulations and rules about bank customer identity verification, due

diligence, and ongoing monitoring or enhanced due diligence of a customer's account after it is

established, and (c) securities laws and rules prohibiting material misstatements or omissions in

Defendants' public filings and statements on these issues.

57.     Defendants retaliated against Plaintiff for making disclosures that are protected under the New York State Whistleblower Protection Law, Labor Law Section 740.

58.     Defendants' violations of the New York State Whistleblower Protection Law were willful, malicious and wanton.

59.     As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost employment opportunities, reputational harm, and other financial loss.

60.     Plaintiff is entitled to all remedies available under the New York State Whistleblower Protection Law, including reinstatement, front pay, compensation for lost wages, benefits and other remuneration, civil penalties under the law, and costs, disbursements, and attorneys' fees.

### COUNT THREE
### (RETALIATION IN VIOLATION OF
### NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT)

61.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

62.     Defendants wrongly engaged in unlawful retaliatory practices in violation of the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. §§ 34:19-1 to 8, by firing Plaintiff after she good faith disclosures to Defendants' Human Resources department and their EthicsLine Online Reporting system about conduct she reasonably believed violated (a) laws and rules designed to protect against aiding and abetting fraud, facilitating money laundering, or otherwise helping customers use funds for illicit purposes, (b) regulations and rules about bank customer identity verification, due diligence, and ongoing monitoring or enhanced due diligence of a customer's account after it is established, and (c) securities laws and rules prohibiting material misstatements or omissions in Defendants' public filings and statements on these issues.

63.    This unlawful retaliation was intentional, deliberate, willful, malicious, reckless and in callous disregard of Plaintiff's rights.

64.    As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost employment opportunities, reputational harm, and other financial loss.

65.    Plaintiff is entitled to all remedies available under the New Jersey Conscientious Employee Protection Act, including damages for emotional distress and attorneys' fees and costs.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Assessing compensatory damages including (a) lost past and future earnings, bonuses and awards; (b) lost back pay, plus interest; (c) reimbursing plaintiff for all litigation costs, expert witness costs and attorneys' fees; and (d) reinstatement;

B.     Assessing special damages for impairment of reputation, personal humiliation, mental anguish and suffering;

C.     For such further relief as deemed just and proper.

**DATED:**     New York, New York
February 26, 2024

By: _____

Rishi Bhandari
Donald Conklin
MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, New York 10005
Tel:  (212) 269-5600
Fax: (646) 964-6667
rb@mandelbhandari.com
dc@mandelbhandari.com

*Attorneys for Plaintiff Ninette Israni*